RITA W. GRUBER, Judge 11 This is an -adoption case in which the natural father of the adopted child is appealing from the trial court’s order granting' the adoption petition of the child’s stepfather. Appellant, Antonio Martini, brings two points on appeal: (1) the trial court- erred in ruling that his daughter could be adopted without his consent, and (2) the' trial court erred in finding that the adoption of a son, with whom appellant stood in loco parentis, was'in the child’s best interest without recognizing"that his daughter’s adoption was invalid. ' We affirm the trial court’s decision. The facts in this case are not in material dispute. Antonio is the former husband of Renita Price, who is the wife of appellee, Christopher Price. • Renita is the mother-of two minor children: a son, G.L., and a daughter, E.M. Antonio is the biological father of E.M. and stood in loco parentis to G.L. Renita and Antonio were married on July 4, 2006, and separated on December 5, 2009, when Antonio was arrested for domestic violence against |2her. At the time of their separation, G.L. was five and E.M. was two. A no-contact order protecting Renita- was entered against -Antonio on December 6, 2009, by a trial court in Washington -State,- where, the parties-were then residing. Immediately after the event, : Renita left Washington and returned with her two children to Arkansas, her home state and the residence of her mother. Renita testified that her mother had lived in a home in Kensett, Arkansas, for twenty-five years and that Antonio had been to this home at least twenty times or more. The Washington court accepted Antonio’s guilty plea and sentenced him on March 25, 2010. At that time, the court entered another no-contact order protecting Renita from Antonio until March 25, 2012. The order did not prohibit Antonio from contacting the children. In May 2012, Renita filed a complaint for divorce. The parties were divorced by a decree entered on October 26, 2012. The decree awarded visitation to Antonio at the discretion of Renita and subject to supervision by the children’s therapist, who was to determine the times, location, frequency, and type of contact. After six months, the parties and the therapist were to review the progress and assess a more permanent visitation schedule according to the therapist’s recommendation. Antonio had two supervised visits with the children in 2012: one in November and one in December. He then saw the children in 2013 for family-therapy sessions on January 16, February 5, and March 26. After the March session, the therapist determined it was in the children’s best interest to discontinue the sessions. Antonio began sending cards to the children in August 2013. Appellee filed an adoption petition to adopt E.M. on August 20, 2013, and an amended petition on |sNovember 6, 2013, including a request to adopt G.L. also. The relevant Arkansas statute provides that consent to adoption is not required of a parent whose child is “in the custody of another, if the parent for a period of at least one (1) year has failed significantly without- justifiable cause (i) to communicate with the child.” Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2009). We construe adoption statutes strictly. In re Adoption of Lybrand, 329 Ark. 163, 169, 946 S.W.2d 946, 949 (1997). A person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. Id. We review adoption proceedings de novo, Hollis v. Hollis, 2015 Ark. App. 441, at 6, 468 S.W.3d 316, 320, but we will not reverse a trial court’s finding that consent is unnecessary unless it is clearly erroneous. Lybrand, 329 Ark. at 169, 946 S.W.2d at 949-50. The issue of justifiable cause is factual, but one that is largely determined on the basis of the credibility of the witnesses. Id. at 169, 946 S.W.2d at 950. We give great weight to a trial judge’s personal observations when the welfare of young children is involved. Id. The following principles apply in analyzing the consent statutes. A failure to communicate without justifiable cause is one that is “voluntary, willful, arbitrary, and without adequate excuse.” Id. at 169-70, 946 S.W.2d at 950. Also, the one-year period may be any one-year period, not merely the one-year period preceding the filing of the petition for adoption. In re Adoption of A.M.C., 368 Ark. 369, 377, 246 S.W.3d 426, 432 (2007). Finally, it is not required that a parent fail “totally” in these obligations in order to fail “significantly” within the meaning of the statute. Id. |¿The.crux of the issue here is not the time period between the parties’ divorce and the filing of the adoption petitions, but the time between the parties’ separation in December 2009 and October 2012, when the parties were divorced. Further narrowing the question before us, Antonio admits that he had only insignificant communications with the children during that period. He argues only that he had “justifiable cause” for his lack of communication. The sole question before us is whether the circuit court clearly erred in determining that Antonio had no justifiable cause for his failure to communicate. The record shows that, between December 2009, when Renita and Antonio separated, and October 2012, when the divorce was granted, Antonio did not see the children at all. On August 10, 2010, Renita sent an email to Antonio telling him that the children would like to talk to him and that if he wanted to talk with them to please have his counselor in Texas call Renita at “(501) 852-XXXX.” ' Neither Antonio nor his counselor called. On August 16, 2010, Re-nita sent an email to Antonio, again explaining that the children would like to talk with him, giving him an email address to use for the children, explaining that she would read his emails to them, and stating that they “would be thrilled to hear from you.” She also mailed a letter with some pictures to Antonio in August, which had a return address of the Arkansas Department of Human Services, Division of Children and Family Services, where Renita was employed. On August 22, 2010, G.L. sent an email to Antonio about his friends and his school. He told Antonio that he missed him' and asked when Antonio was going to write to him. On August 25, 2010, in Antonio’s first contact with the children since the separation in 1 ¿December 2009, he replied to G.L.’s email, stating, “soon [G.L.] ” E.M. also sent an email to Antonio on August 22 explaining that she had started “big girl” school, that she didn’t cry when her “mommy” left her at school, and that she was the teacher’s helper. She said that she missed him and asked him to “please write to me.” Antonio responded on September 15, telling her happy birthday — E.M. was born on September 7 — and that God would bring them all together soon. Antonio sent one more email in December 2010 to wish G.L. a happy birthday. Thus, Antonio’s communication with the children during this three-year period consisted of three short emails in the fall of 2010, two of them in response to the children’s emails to him. ’ Antonio contends that he had “justifiable cause” for two reasons: (1) he did not know where the children were located; and (2) he was under a no-contact order regarding Renita.- Specifically, he claims that he did not contact Renita’s mother in order to inquire about the children because of the no-contact order. He argues that he did not send emails or call the number provided by Renita due to his suspicion that he was being “set up.” First, with regard to the- location of the children, we note that -the parties were married in Arkansas and lived in Arkansas after they married. Renita testified that her mother had lived in a home in Kensett, Arkansas, for twenty-five years and that Antonio had been to this home twenty times or more. Further, by at least August 2010, when he received a letter from Renita with an Arkansas return of address and a phone number that his counselor could call with an Arkansas area code, he was on notice that the children were in Arkansas. The trial court could have found that this information certainly would have given him a | (¡place to start to establish communication regarding his children using a neutral party, his counselor, or legal counsel if he felt uncomfortable initiating such contact himself. All of this evidence was before the trial court. Secondly, the no-contact order did not prevent Antonio from communicating with his children, only Renita. When asked about the letter from Renita with the Arkansas return address, Antonio said that he thought that it might have been “a state agency that was a go between” for communication. But he neither contacted-the agency nor attempted to have his counsel- or or lawyer contact the agency to establish any communication regarding the children. The only evidence before the court that Antonio asked anyone about communicating with the children was his own testimony, about what someone told him: Counsel: Why in the world did you not hire an attorney back in December of 2009, January of 2010, February of 2010, March of 2010 to take care of these visitation issues so that you wouldn’t go two and a half years without seeing your kids? Antonio: While I was on probation? Counsel: Did 'your probation officer prevent you from hiring an attorney to .^settle some'issues'regarding visitation? Antonio: No, but you can’t leave the State of Texas, and they are not in Texas, and I know they are not going to be put on an airplane to come to Texas. [[Image here]] Counsel: So, you could have hired an attorney in Arkansas, talked to him over the phone, and got to at least telephone or Skype visitation with your kids, in that time period. [Objection re: speculation/counsel : agrees to rephrase question.] Counsel: Did you think about getting something like that set up? | 7Antonio: Yes. I asked the probation officer and I did speak with an attorney, one of those initial ones at no cost and I was told by both, wait until your probation'is ov¿r. You do that to open a can of worms and [you’re] going to end up a loser in jail. In response to his attorney’s question regarding what his probation officer told him about sending emails to the. children, Antonio testified as follows: Antonio: If I remember what the pro-, bation office said, as long as Renita is .not communicating with me directly, she has to speak for a two-year-old or a five-year-old because they are not going to type the message and as long as I don’t make any of my verbal to Renita or ask the kids about Renita, keep the conversation with [G.L.] about [G.L.] or [E.M.] and keep the conversation with [E.M.] by [G-L.] or [E.M.] keep it right there confine, you’re okay. Other than three terse emails, Antonio failed for almost three years to communicate with his children: not one card or letter; not a call to the state agency to attempt to establish communication or visitation; no legal intervention; nothing. Moreover, Renita did not thwart his attempts; rather, she attempted to facilitate communication. See Vier v. Hart, 62 Ark. App. 89, 968 S.W.2d 657 (1998) (finding it significant that father never attempted to effect his visitation through legal intervention and finding no. clear error in trial court’s finding that father’s failure to communicate was without justifiable cause in spite of his contention that mother thwarted all of his efforts). Whether there was justifiable cause for that failure is a question of fact that is largely determined on the basis of the credibility of the witnesses, giving great weight tq the trial judge’s pérsonal observations. In re Adoption of Lybrand, 329 Ark. at 169, 946 S.W.2d at 950. The trial court in this case determined that Antonio’s excuses were either not credible or not sufficient to constitute justifiable cause. Given the evidence presented in this case, we cannot say that the trial court’s determination is clearly erroneous. | sIn light of our decision on Antonio’s first point, upholding the validity of E.M.’s adoption, we need not address his second argument regarding G.L. .Affirmed. Gladwin, C.J., and Kinard, Whiteaker, and Brown, JJ., agree. Abramson, Harrison,. Hixson, and Hoofman, JJ., dissent.